# Dilworth's Appeal,

1. Where a storehouse becomes neccessary for keeping a dangerous explosive, the utmost care should be taken in selecting the site, and in its construction, with reference to safety of persons and rights of property. Places of storage of such substances must not be multiplied beyond the business requirements of the neighborhood.

2. When consumption of the explosive article is large, to give or limit the right of storage to a single material or artificial person would impose a heavy burden on consumers for the benefit of the favored party, a wrong a court will not do but for the most urgent reason.

3. It often becomes a grave question whether so great an injury would not be done to the community by enjoining a business that the complaining party should be left to his remedy at law.

4. The circumstances of this case not sufficient to restrain the erection and maintainance of a powder magazine:

October 9th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. GREEN, J., absent.

[Dilworth's Appeal.]

Appeal from the Court of Common Pleas, No. 2, of *Allegheny county :* Of October and November Term 1878, No. 278. In Equity.

Bill in equity, filed by Crawford Robinson and forty-seven others, against C. R. Dilworth and others, to restrain said Dilworth from erecting a powder magazine upon his lot of ground in Penn township, Allegheny county. The case was referred to a master, who recommended that an injunction should be refused and the bill dismissed. The facts are set forth in the opinion of this court.

The court below, Ewing, P. J., issued an injunction pro forma, in an opinion, inter alia, saying :—

" That gunpowder is dangerous, not only to those handling it, but to all who may be in its vicinity, cannot be denied. It is, however, a commodity essential to some of the most important industries of this county and the surrounding country.

" In permitting its manufacture, transportation and storage, it is impossible to protect absolutely the persons or property that may be either permanently or casually in its vicinity. The legal requirements should be so strict as to compel extreme and constant care, and yet they should not be so burdensome as to be impracticable, and thus render them virtually inoperative.

" Where so large a quantity of powder is required as there is in this community, a refusal to permit its storage in carefully constructed magazines, reasonably accessible as points of distribution, would almost necessarily result in the clandestine storage and transportation, where the liability to explosion and the destruction thereby will be greatly increased.

" So far as we are informed, in addition to this one, there are but three powder magazines in Allegheny county, all located in the city of Pittsburgh, to wit: the magazine at the United States Arsenal, and the two magazines referred to in the testimony as belonging to the agency of ' The Dupont Powder Co.' All these have been long established. No explosion has ever occurred at any of them. In the immediate vicinity property has increased in value, and population has settled around them, in apparent disregard of any danger from explosion.

" The master finds, and the testimony fully supports the finding, that this magazine has been carefully located, so as to endanger as few persons and as little property as possible, and yet be reasonably accessible as a point of supply and distribution. We doubt whether any better location could be made in the territory of Allegheny county, which would be reasonably practicable as a point of supply and distribution, and at the same time endanger fewer persons or less property.

" It is in a locality which, for the vicinity of a city, is sparsely settled. Land near it has not been, nor is it likely to be for some

[Dilworth's Appeal.]

years, in demand for building purposes, notwithstanding it is near the terminus of one of our 'magnificent rural avenues.'

"The great danger of explosions of powder is from handling it when the packages have been broken. The actual danger of an explosion of a well-cared-for powder magazine appears rather remote, probably much less than of an explosion of the steam boilers in any of our large manufactories. But the effects of the explosion of a powder magazine when it occurs are so sudden and appalling that persons living near one may well dread the consequences of an explosion on life and property. Some of the complainants, as we have found, are in a situation to entertain reasonable fears of serious injury to their property in case of an explosion. Were it not for the ruling of the Supreme Court in Wier's Appeal, 24 P. F. Smith 230, we would hold that this danger to a few persons would not entitle the complainants to an injunction; that these risks, under the circumstances of this case, would be such as have to be run by thousands of equally innocent persons by the transportation of large quantities of powder by rail through cities; by the operation of steam-engines, and various other risks necessarily run by permitting many legitimate operations, which are necessary to the prosperity of great communities. To enjoin the defendant is, in effect, to grant a monopoly of the powder business of Pittsburgh to the Dupont Co. In our opinion, the public interest would be subserved by refusing the injunction; but, as we understand Wier's Appeal, it goes beyond any of the preceding cases on that subject, and its rulings require us to grant the injunction prayed for. There are several minor points mentioned in that case which are different from the facts in the present case, but in all not sufficient, in our judgment, to permit us to distinguish between the two cases. If we have mistaken the scope of the rulings in Wier's Appeal, the Supreme Court will correct our error by reversing our decree for an injunction.

"Controlled by the rulings in the case of Wier's Appeal, we will enter a decree for an injunction pro forma. An appeal can be taken to the Supreme Court, and heard at the ensuing October Term. We will not enforce the decree until the defendant has had an opportunity to be heard in the Supreme Court.

"And now, September 21st 1878, this cause came on for final hearing on bill and answer and replication, and on the report of the master, with exceptions thereto, and arguments of counsel; and, upon consideration thereof, it is ordered, adjudged and decreed that Charles R. Dilworth be and he is hereby perpetually enjoined and restrained from maintaining a powder magazine, or from storing gunpowder in the building or on the lot," &c.

Kirkpatrick, J., dissented.

From this decree this appeal was taken.

[Dilworth's Appeal.]

*M. W. Acheson* and *Bruce & Negley*, for appellants.—The question in this case is not one of locality, but of monopoly in the business. At Pittsburgh, on account of mining operations and other industries, the consumption of gunpowder is unusually great, and the article is one of absolute necessity. The Act of April 22d 1850, Pamph. L. 538, recognises the necessity and lawfulness of said magazines in said city and vicinity. If this business is, therefore, necessary and lawful, is this case so clear that a court of equity will make a decree that will drive the appellants out of the business, and grant a monopoly of the trade to one company? This case, in its circumstances, is essentially different from Wier's Appeal, 24 P. F. Smith 230.

*Barton & Sons,* for appellees.

Mr. Justice Trunkey delivered the opinion of the court, November 17th 1879.

Adhering to the principles, in the fulness of their spirit, so well expressed in Wier's Appeal, 24 P. F. Smith 230, they need not be repeated in the same or different phrase. Nor will we quote at length from the opinions in Richards's Appeal, 7 Id. 105; Rhodes *v.* Dunbar, Id. 274, and Huckenstine's Appeal, 20 Id. 102, to show the many things a chancellor must consider when called on to strike down a lawful business, necessary to be carried on for the public weal. ⟦It often becomes a grave question whether so great an injury would not be done to the community by enjoining the business, that the complaining party should be left to his remedy at law. ⟧ When a storehouse becomes necessary for keeping a dangerous explosive, the utmost care should be taken in selecting the site, and in its construction, with reference to safety of persons and rights of property. Places of storage of such substances must not be multiplied beyond the business requirements of the neighborhood. When consumption of the article is large, to give or limit the right of storage to a single natural or artificial person, would impose a heavy burden on consumers for the benefit of the favored party—a wrong a court will not do, but for the most urgent reason.

The circumstances of this case are so similar to those in Wier's Appeal, that the plaintiffs rely on that as decisive for them. It was there said, by the present Chief Justice, that, "The great difficulty in all cases of this character is not in the ascertainment of the true rule of equity, but in the application of that rule to the facts. While it may be easy to draw the line between what is and what is not a nuisance, which equity ought to enjoin, it is by no means so easy to determine whether the circumstances of any particular case ought to place it on one side or the other of that line. It is rare that any number of men will be found to agree upon

such a question." The truth of this observation was illustrated in the case itself; for the court below, following the master's recommendation, dismissed the bill, and two of the five judges, then constituting this court, upon the facts, not the law, dissented from the decree. Manifestly, the authority of that decision does not compel an injunction where the complainants do not present a state of facts of at least equal strength. Then it is material to learn what were the facts as viewed by the majority of the court; and this can best be done from the clear statement of them in the opinion—"Perhaps the immediate neighborhood is not so densely filled up—in connection with the evidence in the case of the careful construction and location of the building to guard against the worst probable consequences of an explosion—as would justify the court in ordering its removal. But, as we have shown, this is not the case. The neighborhood is not thickly settled, but is fast filling up. Land is in demand for small buildings, villas and country residences, and its market value before this structure was contemplated was at a high figure. It is evident that it must sensibly affect that value and the growth of the district. This might not, however, be sufficient of itself. The borough of Sharpsburg is a thriving surburban village of this great western metropolis, where already many persons engaged in professional, mercantile or manufacturing business, have purchased sites, erected houses, and permanently reside, in order to escape from the smoke, soot and noise of the city. The distance of the structure complained of from the line of the borough is about half a mile. * * * But besides all this, a public turnpike-road runs very near the building. As the master reports, 'from the centre thereof to the magazine, the distance is one hundred and fifteen feet, or ninety-five feet from the inner edge.' It is peculiarly exposed to danger, for the magazine is constructed in a ravine, funnel-shaped, opening out towards the road. It presents, with its rocky bed and sides, a huge mortar aimed directly at the turnpike." That turnpike was one of the principal roads leading from Sharpsburg into the adjacent townships. The court doubted if the neighborhood of the magazine was so densely filled up as to justify ordering its removal; said it was fast filling up and land was in demand for dwellings, doubting if that would be sufficient; remarked its proximity to Sharpsburg, and laid stress upon its situation to the public thoroughfare.

After a careful revision of the master's report by the court below, the facts found in this case, and which are well sustained by proof, are as follows : This magazine has been located so as to endanger as few persons and as little property as possible, and yet be reasonably accessible as a point of supply and distribution; it is more remote from population than the magazines generally in use throughout the United States, and it is doubtful if a better location could be made in Allegheny county. It is situated about two miles

[Dilworth's Appeal.]

from East Liberty, the nearest closely built-up district, and is separated therefrom by intervening hills and ravines. It is in a sparsely settled locality, for the vicinity of a city, and land near it has not been, nor is it likely to be for some years, in demand for building purposes. That portion of Lincoln avenue which terminates at a point five hundred feet from the magazine is very little travelled, very few people travel it within considerable distance of its terminus, having no occasion to do so; it was the wildest of the many absurd enterprises undertaken in Pittsburgh to carry city improvements into wild rural regions, expecting population to rapidly follow. The other public road, passing within twenty-two feet of the magazine, has for some time been almost abandoned by the people in the vicinity, and is used by about three farmers. The magazine is so situated that the force of an explosion would be down the ravine and away from the road. The greater distance of this magazine from a borough, or closely built-up district, the absence of demand of land for building purposes, and the unlikelihood of such demand in the vicinity, the little travel on the public road which passes near it, and the ravine opening from the road, are the chief points wherein this case differs from Wier's Appeal. The dwellings and families near the magazine number about the same in one as the other. (None will deny that the law protects the small and cheap home as it does the large and costly mansion, and the rights of a tenant are as sacred as those of his landlord. But it is equally undeniable that if a tenant hold by lease at will, or by month, and his landlord grants that a lawful and necessary, yet offensive or dangerous factory or magazine may be erected, the tenant has not a right of action for its prevention.) If such structure were placed near tenant houses occupied by miners, where the mines are likely to be worked for considerable time, it would be a material fact to be weighed with others—almost of like weight as if the houses were owned by the occupants. Here the mine is nearly exhausted, a fact to be considered in reference to the probable increase of population in the neighborhood.

It was urged that the location being only two hundred and fifty-five feet from the boundary line of Pittsburgh, and five hundred feet from the end of Lincoln avenue, is dangerous to life and property in the city. The facts, as we have seen, are that that end of the avenue is very little travelled, and is remote from the population of the city; and, without question, "the region of country in which the magazine is located is wild and broken as to its general surface, it is traversed by numerous ravines and hills, and altogether possesses a romantic and secluded aspect." It is the real character of the location, with its surroundings, which determines its fitness, and not a city line two miles from city life, nor the unused and useless part of a graded and paved street extended beyond the visible city.

[Dilworth's Appeal.]

Confessedly, the demand for and consumption of powder in Pittsburgh and vicinity are very great, and it is indispensable in carrying on important branches of industry, and it would be inimical to the business interests of the community to trammel the sale of it with unnecessary restrictions and burdens. Besides the magazine at the United States Arsenal there are no others in Allegheny county, except those of a single company, and the Dilworth. In view of the whole case the master, and one of the judges of the Common Pleas, thought the injunction should be refused. The majority of the court, in a considerate opinion, concluded that the public interest would be subserved by refusing the injunction, and that the complainants were not entitled to an injunction, but for the ruling in Wier's Appeal, on the authority of which they felt constrained to grant it. A decree was entered, with direction that it would not be enforced until the defendant could be heard on appeal. We fully agree with the court below, except that we do not think the principles in Wier's Appeal, applied to the facts in this case, require an injunction to be granted.

　　　　Decree reversed, and it is now considered and decreed that the bill be dismissed. The defendant below, Charles R. Dilworth, to pay the costs, including costs of appeal, except plaintiffs' costs and their witnesses.