## W. G. PRICE ET AL. v. GEORGE GRANTZ.

ERROR TO THE COURT OF COMMON PLEAS NO. 2 OF ALLEGHENY COUNTY.

Argued November 9, 1887—Decided January 3, 1888.

1. When, in an action against defendants operating a leadworks and shot-tower, the plaintiff has declared as for a public nuisance with an averment of special damage, and the plea is the general issue, he must show that in operating their works the defendants were maintaining a common nuisance—inconvenient and troublesome to the community—and that he suffered a special or peculiar injury therefrom.
2. Where there is evidence from which the jury might find that an injury from lead-poisoning was suffered by but a single individual and because of an exceptional susceptibility to such influences, while the traces of noxious emission were so slight as not to affect others, such injury would not be sufficient to sustain an averment that the leadworks was a common or public nuisance.

3. When the defendants were engaged in a lawful business, in order to sustain an action for an injury resulting therefrom, the injury must be shown to have been real and substantial, not a trifling annoyance or injury such as is necessarily incident to the business complained of.

Before GORDON, C. J., PAXSON, STERRETT and WILLIAMS, JJ.; TRUNKEY, GREEN and CLARK, JJ., absent.

No. 163 October Term 1887, Sup. Ct.; court below, No. 276 April Term 1885, C. P. No. 2.

On February 27, 1885, an action in case for maintaining a nuisance was brought by George Grantz against W. G. Price and Mary Lane, partners as William G. Price & Co., the Berlin Iron and Lead Co. and others. The declaration described the property owned and occupied by him and his family and complained:

And the said defendants have been the owners or lessees and possessed for many years of a lot or piece of ground situate in said city of Pittsburgh, adjoining the premises of said plaintiff; and said defendants on or about the spring of 1883 did unlawfully cause to be built on said premises certain buildings and a tall tower for the manufacture of lead pipe and shot, etc., and in the said buildings and tower the said defendants have since carried on the said manufacture of lead pipe, shot, etc., and in the same use large quantities of arsenic and lead and other poisonous minerals, and in the said manufacture did cause said lead to be heated. and melted and caused the same to be hoisted to the top of said tower about two hundred feet high and mixed with arsenic and poisonous ingredients, and thence cast and passed through separators and fall to the ground, and when so doing, when the wind is blowing in the direction of the plaintiff's premises, poisonous parts, dust or atoms produced thereby are carried over into and upon the premises of said plaintiff and are mixed and intermingled with the air and water, carpets, furniture, bed-clothing, fuel, etc., in and upon the premises of said plaintiff and there breathed into and absorbed into the mouth, nostrils, throat, lungs and body of said plaintiff, his wife and his family, causing and producing lead-poisoning, cramps, sores and other diseases of their systems; injuring and destroying their health and endangering their lives, and thus rendering said plaintiff's premises

unfit for habitation, and creating, causing, keeping up and continuing a common nuisance, and the same has been so kept up and continued from the time of the erection of said shot tower and leadworks until the present time and is still so kept up and continued, by reason whereof said plaintiff has suffered, etc.

The plea was not guilty.

At the trial on March 2, 1887, the facts appeared: Wm. G. Price & Co., iron founders, in 1880 added to their business a plant for the manufacture of lead pipe, and in 1883 a shot-tower and machinery for the manufacture of shot. The iron foundry and leadworks were at the corner of Fifth avenue and Price street, in a well settled part of the city. The building constituting the leadworks was what was known as an iron-clad, 30 feet in width by about 120 in depth, and, fronting on Price street, was separated from the foundry by an alley. The shot-tower, which was of brick and about 175 feet high, stood in the rear of the leadworks, and running from it was a warehouse for lead goods fronting on Fifth avenue. On the west side of this warehouse and in the angle of the warehouse and lead factory, was the residence of Mrs. Lane, one of the defendants, and on the east side of it was the property of the plaintiff, on which was a brick building occupied by him as a dwelling. In September, 1884, the plaintiff's wife was prostrated with sickness which her physician diagnosed as lead-poisoning. The plaintiff complained to the city board of health that the defendants were maintaining a nuisance dangerous to the health of the neighborhood, but the board did not interfere, and this suit was brought.

The plaintiff introduced evidence that his wife and every member of his family suffered from lead-poisoning, the wife most seriously. The defendants, claiming that the plaintiff had declared upon a common nuisance, introduced evidence that their works were operated in the methods practiced by similar manufactories; that lead factories and shot-towers, similar in construction and operation, were created and maintained in thickly settled parts of the principal cities; that the vapors of lead were generated only when the metal was subjected to a temperature exceeding 2600 degree F.; that in defendant's manufacture of lead pipe the metal was subjected to

a temperature only sufficient to melt it and maintain it in a molten state, or about 600 degrees F.; and, that in the making of the combination of lead and arsenic, called "temper," used in the manufacture of shot, the conditions were such that no danger could result to the neighborhood. Neighbors testified that no offensive vapors had ever been observed since the erection of the shot-tower and leadworks. Physicians testified that they knew and had heard of no cases of lead-poisoning in the neighborhood excepting the single case of Mrs. Grantz, and that some persons were more susceptible to the noxious effects of lead than others.

The court, MAGEE, J., charged the jury:

Counsel have presented certain points which, in connection with what I may have to say in my charge, will, perhaps, cover what is the duty of a court in a trial of a cause, and that is to give to you what is the law of the case, leaving the facts to be determined by you, which properly belongs to you, and which is cast upon you as a duty under your oaths.

The plaintiff's points:

1. That a leadworks or manufactory situated or operated in a city or populous district is a nuisance per se.

Answer: Refused.

2. That a shot manufactory located and operated in a city thickly inhabited is a nuisance.

Answer: Refused.

The defendants' points:

1. Under the pleadings in this case the plaintiff must show that the defendants in operating the leadworks and shot-tower, or one of them, were guilty of maintaining a common nuisance which was inconvenient and troublesome to the whole neighboring community in general, and that from the same the plaintiff suffered a special or peculiar injury.

Answer: Refused.[2]

2. Under all the evidence the plaintiff has not shown that either the leadworks or shot-tower was a common nuisance.[3]

Answer: Refused.

If the court so decline to charge, then:

3. The burden of proof is upon the plaintiff to show, (1) that the defendants were guilty of maintaining a private nui-

sance in the operating of the shot-tower or leadworks; and, (2) that as a result from such operation he (the plaintiff) suffered injury, and a failure on the plaintiff's part to prove both of such propositions to the satisfaction of the jury would prevent a recovery.

Answer: Affirmed.

4. That the mere fact that the plaintiff's wife, or himself, or his children, suffered from lead or arsenical poisoning, is not sufficient to enable the plaintiff to recover; but the plaintiff must prove that such poisoning was caused by the operation of either the shot-tower or the leadworks by the defendants.

Answer: Affirmed.

5. The plaintiff, to recover, must show an actual and substantial interference with and annoyance to him or his property in the use and occupation of this property, and a slight and rare damage would not entitle him to recover.

Answer: This point, as an entire proposition, is refused.

While it is true that an actual and substantial interference must exist, the plaintiff may still recover for a slight and rare damage, if that damage be actual and substantial, and the result or the effect of a nuisance created and maintained by the defendants.[4]

6. If a person lives in a city like Pittsburgh, he or she of necessity submits himself or herself to the consequences and obligations of trades which may be carried on in his immediate neighborhood; and if the jury believe that the shot-tower and leadworks are carried on without injury to life or health, and without noisome smells, the plaintiff cannot recover.

Answer: Affirmed.

7. The defendants are entitled to use their property for any lawful business, though it may be in a slight degree inconvenient or unpleasant to the owners of the adjoining property; and to entitle the adjoining owners to suppress such works, they must show that such business is injurious to life or health, or emits such noisome smells as would render the plaintiff's property unfit for occupation.

Answer: Affirmed.

8. The plaintiff cannot recover unless the jury should be satisfied from the evidence that the leadworks or shot-tower, as conducted by the defendants, was either a common or private nuisance.

Charge of Court below.

Answer: Affirmed.

9. In determining this case the jury should remember that the plaintiff does not claim that either the leadworks or the shot-tower was run by defendants in a negligent manner; and should the jury think that the said works, run in an ordinarily careful and skilful manner, would not be a nuisance, either public or private, the plaintiff could not recover, even though the jury should also think that, by some carelessness or negligence of defendants' employees at the time of the fire, or at some other time, the plaintiff or his family were hurt.

Answer: Affirmed.

10. The effect of a peculiar and very exceptional idiosyncrasy or susceptibility on the part of a person, by which he or she may be affected by a slight trace of arsenic or lead, which would not in any degree affect other persons, would not be such an injury as would of itself condemn the source of such effect as a nuisance.

Answer: Refused, as being only a naked proposition, unconnected with the facts of the case.[1]

[The court then read the declaration.]

That is the substance of the claim as presented in his declaration. I am not giving it as anything that is proven, but simply what is stated as the ground of his complaint. To this declaration the defendants plead not guilty, a general denial of their liability in this action. It is a well settled principle in law that the owner of land may make use of it according to his own pleasure, and for any purpose, provided that in the use thereof he does not injure his neighbor or the public. Sic utere tuo ut alienum non laedas; so use thine as not to injure another, is a maxim which the law requires shall be observed by every one, and is the only limit to unqualified and unrestricted liberty in the use to be made of property by the owner. It is the right, therefore, for any one to carry on any lawful business on his own land if the operations and results be entirely confined to his own premises and do not affect, endanger or injure any person outside. The manufacture of lead pipe and shot is not an unlawful business in itself, and therefore can be carried on if conducted so as not to injure individuals or the public. If the manufacture, however, becomes a nui-

sance, it can be controlled; if a common nuisance, by indictment; if a private nuisance, by an action for the damage sustained by the individual, and in some cases, of an aggravated character at least, by abatement through the instrumentality of a bill in equity at the instance of the private sufferer. The injuries complained of here are such that, if caused by the defendants in the use of their property and in the transaction of their business, the plaintiff would be in law entitled to ask for redress. To use one's own property in such a way as to create poisonous odors and the like whereby his neighbor's health and comfort are endangered or destroyed, and his premises rendered uninhabitable, or dangerous to be occupied, could not be regarded as the use of " thine so as not to injure another."

The plaintiff does not allege that he has sustained any injury or damage by reason of negligence on the part of the defendants. Negligence, therefore, is not an issue in this controversy. The allegation is that the defendants unlawfully erected works in which large quantities of arsenic and lead and other poisonous minerals were used, and that the atoms, particles, dust and poisonous odors therefrom were cast into and upon the premises of the plaintiff, to his great damage, and to the creation and maintenance of a common nuisance. A nuisance is defined to be " anything done to the hurt or annoyance of the land, tenements or hereditaments of another." A common or public nuisance becomes a private nuisance also when it especially annoys or injures an individual.

An actionable nuisance is anything wrongfully done or permitted which injures or annoys another in the enjoyment of his legal rights. It is not meant by this that every annoyance is actionable. There are annoyances without fault, and such as in the reasonable use of property must be borne with by others. [But I need not discuss the subject further than to cite from the Pennsylvania Lead Co.'s App., 96 Pa. 116. In that case, Justice GORDON, quoting from Blackstone, says : " If one erect a smelting house for lead so near the land of another that the vapor and smoke kill his corn and grass and damage his cattle therein, this is held to be a nuisance." He also adds : "All intelligent persons are aware that lead vapors are poisonous, and this the more so, as they are often, as in this case in

hand, accompanied with arsenic." The Pennsylvania Lead Co. was engaged in smelting ores, while the present defendants are not so engaged, but in both cases the product of the works is obtained by the use of lead and arsenic in its manufacture. Under the authority of this decision I am of the opinion that it is a nuisance to erect and conduct works which produce like effects to that of the Pennsylvania Lead Co., although not engaged in the same business.][5] If the use of lead and arsenic produce the deleterious and poisonous effects indicated in the case, no matter what the business conducted may be, it would be regarded as a nuisance, and one which could be abated by an injunction. You will therefore determine from the evidence produced in your hearing in court and from your inspection of the premises made by consent of the parties, first, whether the defendants in the prosecution of their business created and cast upon the plaintiff's premises the poisonous vapors, atoms, particles, dust and odors complained of; and second, if you find such to be the fact, to ascertain the amount of the damage and the extent of the injury which the plaintiff has sustained therefrom. If you find that no nuisance was created and maintained, your verdict will be for the defendants. If, however, you should find otherwise, it will be necessary that you should know the measure of damages as prescribed by law for the injuries which have been sustained. The damages claimed by the plaintiff are of three kinds: 1. For injuries to his person and health. 2. For injuries resulting to his real estate. 3. For injuries to his wife and children. . . . . .

The verdict was for the plaintiff for $700, and, judgment being entered, the defendants took this writ assigning for error:

1–4. The answers to the defendants' points. [1 to 4]

5. The part of the charge embraced in [ ] [5]

*Mr. William S. Pier* and *Mr. D. T. Watson,* for the plaintiffs in error:

1. The declaration against the defendants was for maintaining a public or common nuisance, out of which he sustained special damage. If the leadworks and shot-tower had been emitting poisonous vapors into the atmosphere, as charged, the natural inference is that they would have constituted a nuisance prejudicial to the entire community. But, there was

Arguments.

testimony which would have warranted the finding as a fact that if Mrs. Grantz suffered from lead poisoning from these emissions, it was because she was peculiarly susceptible to such influences. The rule of law is, that one cannot be held as a tort-feasor for acts which are ordinarily harmless: Greenland v. Chaplin, 5 Exch. 248. Our tenth point, therefore, was not an abstract one, unconnected with the facts of the case, and the reason for refusing it was unsound.

2. The testimony offered by the plaintiff to prove the maintenance of the common nuisance charged, was but slight. The testimony of the defendants was overwhelming to the contrary. The court refused to charge that under the declaration it was necessary to the plaintiff's recovery that he show a common nuisance. Yet, if the judgment upon the verdict is to stand, the fact of a common nuisance at the time of the accident is res adjudicata, and the defendants are henceforth estopped to deny every material allegation in the record necessary to support the judgment.

3. Our proposition that the plaintiff could not recover for a slight and rare damage, was founded on the rulings in Rex v. Tindall, 6 Ad. & E. 143: Tipping v. Smelting Co., 116 E. C. L. R. 608; Huckenstine's App., 70 Pa. 102. The qualification to the refusal of the defendants' fifth point, was confusing, and not such an explicit statement of the law, as the defendants were entitled to have. Moreover, the reference in the charge to Penn. Lead Co.'s App., 96 Pa. 116, was prejudicial, in that our case was made like another in which this court, upon entirely different facts, had adjudged the defendants' works a nuisance. The facts of that case were unknown to the jury, and they could not know why a nuisance was established there nor discriminate the features of that case from this.

*Mr. W. D. Moore* (with him *Mr. John Barton* and *Mr. F. C. McGirr*), for the defendant in error :

1. We do not concede that the delaration charged defendants with maintaining a public nuisance. Anything seeming to so charge may be rejected as surplusage. If the effect of the clause relating thereto be feared by the defendants, we are satisfied to amend by striking it out and so ask leave, if this court should deem the matter material. But there was an

abundance of testimony from which the jury might find that defendants' works were a common nuisance. Nine witnesses testified to the nauseous and offensive odors from these works.

2. That the next step might be a bill in equity to enjoin operation, after this verdict at law, amounts to nothing, as such a bill might be sustained without a previous action to determine the question of nuisance: Penn. Lead Co.'s App., 96 Pa. 116.

3. In answer to the first assignment we have only to state that the court below was not asked to charge the jury that if Mrs. Grantz suffered from lead poisoning caused by matter escaping from defendants' works and shot-tower, on account of her peculiar susceptibility to lead poisoning, and no one else so suffered, defendants could not be held liable for maintaining a nuisance. The point which is the subject of this assignment of error is a mere abstract proposition, entirely ignoring the facts of the case, and was properly refused. The testimony, as already referred to, shows that the remaining four members of plaintiff's family were affected in same manner as his wife; not so seriously, as she almost died, but to such an extent as to cause vomiting, sores, boils, ulcers, swelling of the limbs and extreme pain. Whether Mrs. Grantz was more susceptible to lead poisoning than the others, or whether her greater and graver illness was due, as her husband explained, to the proximity of the rear part of the house, where she usually was, to the shot-tower, we think immaterial, as in neither case would it relieve defendants, and plaintiffs in error cite no cases which hold otherwise. According to the expert evidence, great numbers of people are more susceptible to lead poisoning than others; but are they not entitled to protection from these deadly works, operated, as defendants' works were, in the residence portion of the city?

The remaining assignments of error, the fourth and fifth, require no answer. The Penn. Lead Co.'s App., 96 Pa. 116, rules the present case and on it we rely.

OPINION, MR. JUSTICE PAXSON:

The learned court below declined to affirm the defendants' tenth point, for the reason that it was only a naked proposition, unconnected with the facts of the case.

I assume the learned judge would not have denied the point, had he considered that there was evidence from which the jury might have found the facts of which it is predicated. An injury to a single individual from lead poisoning, because of a peculiar and exceptional susceptibility of such person to such influence, when the trace of arsenic or lead was so slight as not in any degree to affect other persons, would not be sufficient to make the leadworks a common or public nuisance. So plain a proposition does not need elaboration.

We turn then to the question whether the court was correct in assuming that the point was a mere abstract proposition, unconnected with the facts of the case. Here we think the learned judge inadvertently fell into error. It is true there is no direct testimony as to the alleged peculiarity and susceptibility of the wife of the plaintiff below to the influence of lead and arsenic, and it was, doubtless, this circumstance, which, in the hurry of the trial, misled the court below. The fact was overlooked that there was testimony from which the jury might have drawn such an inference. Thus, if we have the proof that one person has sustained injury from the fumes thrown out by the leadworks, while one hundred other persons equally exposed to its influence are not affected by it in any degree, the jury would have a right to infer that the one person had " a peculiar and very exceptional idiosyncrasy or susceptibility " to the influence of lead and arsenic. We think there was enough evidence to submit upon this question, and that the point should have been affirmed.

We also sustain the second assignment of error. The plaintiff declared as for a common and public nuisance, with an averment of special damage. The plea was the general issue. By the defendants' first point the court was asked to instruct the jury that, " under the pleadings in this case, the plaintiff must show that the defendants, in operating the leadworks and shot-tower, or one of them, were guilty of maintaining a common nuisance, which was inconvenient and troublesome to the whole neighboring community in general, and that from the same the plaintiff suffered a special or peculiar injury." This point the court refused, and the jury found a verdict in favor of the plaintiff for $700.

As between the parties, as the record now stands, the effect

of the verdict is to establish the fact conclusively that the works of the defendants are a common nuisance. With the facts thus established by a verdict at law, it might be a question whether a court of equity could refuse to enjoin the further operation of the works as a continuing nuisance. Yet if the jury had been instructed that, under the pleadings, they must find the works were a common nuisance, to entitle the plaintiff to recover, they might well have hesitated to do so under the evidence. The weight of the evidence was the other way. An error is sometimes rendered more palpable by a consideration of the results which logically follow it. Were there nothing else in the case we would hesitate to reverse for this reason, as the narr. might have been amended below, but as the case must go back it is proper to refer to it.

The defendants' second point if affirmed would have withdrawn the question of nuisance from the jury, and it was not error to decline it.

By the defendants' fifth point the court was asked to instruct the jury, that "the plaintiff to recover must show an actual and substantial interference with, and annoyance to him or his property in the use and occupation of his property, and a slight and rare damage would not entitle him to recover." This point was answered as follows: "This point as an entire proposition is refused. While it is true that an actual and substantial interference must exist, the plaintiff may still recover for a slight and rare damage if that damage be actual and substantial, and the result or effect of a nuisance created and maintained by the defendants." I do not regard this answer as clear or as consistent with itself. As the case must go back for a re-trial, it is proper to say that, in our opinion, the plaintiff can only recover for a substantial injury. The defendants were engaged in a lawful business. Whether they made a judicious selection of a site therefor, in view of its character and the nature of its surroundings, is a question as to which I express no opinion. But they are entitled to a reasonable enjoyment of their property, and mere trifling annoyances or injuries necessarily incident thereto would not move a chancellor to restrain their operations: Rhodes v. Dunbar, 57 Pa. 274; Huckenstine's Appeal, 70 Pa. 102; Rex v. Tindall, 6 Ad. & E. 143; Tipping v. St. Helen's Smelting Co.,

116 E. C. L. R. 608.   So I apprehend a rare and trifling injury necessarily resulting from a lawful business would not sustain an action at law.   It must be a real, substantial injury.   Were it otherwise, many occupations could not be carried on at all in large cities.   There are some injuries too slight and exceptional to be recognized as a bar to the active industries of the country.   Every lawful enterprise contributes to the public good.   It furnishes employment to the idle, promotes every other branch of industry, and in this way indirectly benefits the whole community.   It is not unreasonable that the individual members of the community thus benefited should make some slight sacrifices for the public welfare.

The fifth and last assignment alleges that the court erred in that portion of its charge in which reference was made to the Penn. Lead Co.'s App., 96 Pa. 116.   We think it was an unfortunate reference for the defendants, and, under the circumstances, could not have failed to influence the jury.   The cases are widely different, and, although the learned judge told the jury that " The Pennsylvania Lead Company was engaged in smelting ore, while the present defendants are not so engaged, but in both cases the product of the works is obtained by the use of lead and arsenic in its manufacture," yet the court failed to point out the essential difference between them.   This is apparent from the next sentence of the charge : " Under the authority of this decision I am of the opinion that it is a nuisance to erect and conduct works which produce like effects to that of the Pennsylvania Lead Company, although not engaged in the same business."   From this language the jury could hardly fail to draw the inference that, inasmuch as the Pennsylvania Lead Works had been declared to be a nuisance, if the defendants' plant produced like results, it must also be a nuisance.   The difference in degree was wholly overlooked.   Whereas it is claimed by the defendants that if their works do throw off the noxious substances referred to in the case of the Pennsylvania Lead Company, it is in such small quantity as not to affect the general health and comfort of the neighborhood.   It would be better in the next trial of this case to omit all reference to the case in 96 Pa.

Judgment reversed, and a venire facias de novo awarded.